May it please the court, my name is Rob Weinberg. I represent the defendants in these consolidated appeals, former chief of police Paul Suba, and police officers D.B. Anciano and Serafino Artui. I'd like to reserve two minutes if I can. Certainly. Mr. James Adkins was arrested in October of 2009. This is a qualified immunity case so the question is what was the law in 2009? My question in these cases is what do I do, what do I go back to Guam and advise the Guam police department officers and chief of police now about what the law is in this kind of situation? What particularized right or rights are we concerned with here? Is it that there is a right to take photographs in public places? Yeah, there's a general right to take photographs. Is it that you have a right to argue with the police? Yeah, there's a right to argue with the police and state your state of mind. Is there a right to refuse to comply with the police when they say get out of your car and you reply in argument I'm not going to get out unless I'm under arrest and then you're arrested? Is there a clearly established right to refuse to do that? No. That's what we have here. Well, if there's no valid right to detain someone and the police then orders you out of the car, aren't you entitled to say you don't have any reason to stop me? I won't get out of the car. Two points, Your Honor. The second point first. The answer is no. In the briefs I cite cases that say that even if you were falsely arrested, you don't have a right to resist arrest. So even if the police detained you wrongfully... Do you consider that resisting? No, Your Honor. I'm making a parallel from the case that I cite. I forgot what happened. When he wasn't resisting, he conditioned his removal from the car. He said I'm not going to comply with your directive to exit the car unless you put me under arrest. Because you don't have a reason to stop me in the first place. Let me get to the merits of that. Yes, Your Honor. Now, here's the problem. If we look at this in the chronology of the complaint, we have to deal with the facts that we have from the complaint. Mr. Atkins was stopped. He says he was stopped on his way as he was leaving. He stopped his car at one place, and then he took photographs of the accident scene, and then he says he was leaving. So we have to assume that to be true. Mr. Weinberg, you're not suggesting there's any dispute in the facts of this case, are you? I'm not entitled to argue that there's a dispute at this stage of the litigation, Your Honor. I have to go with the complaint. All right. At the next stage, I may. At the next stage, if this case is not reversed, I will dispute the facts. But going with the facts that Mr. Atkins I laughed because I thought you might be anticipating the result, knowing what you know. No, my job is to convince you of what the result ought to be and what the correct result is. But let me get back to Judge Wein's question. And this is the plaintiff's framing of the argument, is that you didn't stop me for a legitimate reason. Therefore, I'm entitled to do what I want. I'm being a little loose with it here. But I think the argument is, if you did not stop me legitimately, I don't have to comply with anything you say after that point. Not only is that an invitation to anarchy and chaos, but that's legally wrong. On the facts of this case, the question is, at that point, was there anything unconstitutional about one of the officers stopping out, according to the complaint, stopping the plaintiff and saying, you can't take photographs here? Is the law clearly established that a policeman cannot do that? No. Don't you have to consider the circumstances? If a policeman tells a person who stopped and interfered with police work, you've got to move. That's one thing. He had pulled to the side, hadn't he? He wasn't interfering in any way with what the police were doing. He just photographed it. That's what he says? And that's a jury argument, Your Honor, at a criminal trial? Tell me, counsel, are you saying that's not what the record shows? The record that we have is the complaint and the photograph that he supplied, which is at the record excerpts of page 51 of Arturo Iannaciano's appeal. So looking at the geometry of it there, we have, from your point of view, we have the plaintiff, we have the wall on the left. I'm going by the record, and that's what I hope you're going to do. Well, yes, Your Honor, the record is the photograph. That's what the record shows, of where the wall was, where the accident was, where the wall was, and according to him, where the police were. So what he says is that he stopped on the road, or he pulled off the road to the right in his Second Amendment complaint. He says, I pulled off the road to the right, and I took photographs, and as I was driving away, a police officer stepped out in front of me and stopped me. Right? So what's the reasonable suspicion or probable cause that would have supported that initial detention? The cases hold that so long as you think a crime is in progress or is about to be committed, or is being committed, or is about to be committed. What is the crime in progress or is about to be committed? Obstructing governmental operations. Let me say this. Mr. Atkins was stopped from an objective point of view. He was stopped because police officers said, he was stopped for the reasons that he was about to obstruct governmental operations, what he was doing. That's my answer to that question. He was stopped for that. He was arrested for failing to comply with the directive to get out of his vehicle on command. Now, the law does not say that police officers cannot approach a private citizen, whatever he or she is doing, and say, excuse me, sir, you're violating the law, or I want you to stop, don't do this, you'll be in violation of the law. I come from Guam, I come up here and I see all these smoking, no smoking, you can't smoke anywhere. And I'm looking for a place to smoke and I'm going, where do I do that? But if I were approached by a police officer or somebody in uniform and said, you can't smoke because I say so, my response as a good public citizen is, thank you, officer, I'll move on. Now, what Mr. Atkins wants to do is speculate about the evil intent of the police officers in stopping him, in wanting to look at his photographs, in saying, get out of the car. Let's speculate about the evil intent of the bad police officers. And the law on qualified immunity, particularly with respect to police officers, says you can't do that. We do not speculate about the subjective intent or motivations of the police officers if there was a reasonable objective basis for what they did or what they are alleged to have done. So my answer to the question, what was he stopped for? He was stopped because from an objective basis, looking at the photograph and where he places the actors in that, he was stopped and told, you can't take photographs here. Now, that may offend our sensibilities, but the question isn't whether it offends our sensibilities. The question is, does it violate clearly established law that a police officer cannot approach somebody, rightly or wrongly, and say, you can't stay here, you can't take photographs here. Now, while we're engaging in hypotheticals, had Mr. Atkins said, oh, I'm sorry, officer, I'm moving on, then that would have been the end of it. That's not in the complaint, though, is it, Your Honor? It's not. Not only is it not in the complaint, he was moving on. Well, that's what he says, but had he said, yes, Your Honor, and I'm not arguing about that. I'm going with those facts. He says I was moved on, but does he say I was trying to comply, I was trying to move on? He doesn't say that. What he says, Your Honor, is I have a right to take photographs at this place and you can't stop me. Now, wait a minute. That's the next question. Does he have a clearly established right to go in and take photographs? Now, this is the question that I, as a lawyer for the Guam Police Department, and anybody else I'm going to represent have to ask myself. Is there, in that fact pattern, a clearly established right to take photographs? The cases, I won't say they're all over the board, but we don't have any cases that say that. Here's what we do have. We have cases where somebody says in his complaint, I'm exercising my First Amendment rights, either to take photographs, I have a right to take photographs, or to argue with the police, and we have two cases from this circuit that says the police's authority to tell you what to do trumps your supposed First Amendment right. Those cases are the Chavez v. City of Oakland and Young v. County of Los Angeles. So we still have to look at what is the right, and it's like, imagine a clock that's ticking minute by minute here. At what minute here is the rights clearly established? Can the police officers not, can the police officers say, never approach somebody, even if they're driving away, and say, you're obstructing governmental operations, don't do that? Can they not do that? I think the case law says exactly the opposite, that they can. That you don't have to witness a crime in progress if you think one is about to be committed, or has been committed. Police officers can do that. Can they, now here's the problem, can they demand to see the photographs? Can they demand to see what's going on in that? That's a little sticky, and I'm not quite sure I understand why, but I do have an explanation, and an objective reason is, that person has now taken photographs of the crime scene, and it is a crime scene, by the way. But nobody will ever see them. I'm sorry? Nobody will ever see the photographs. That's a separate issue. It is a separate issue, and doesn't involve Anciano and Arturi, because in the clock here, that issue comes after the first complaint is filed in here. Their motives may very well have been to destroy the photographs. Why? I don't know. But let's just go with that theory. If that's the case, is the law clearly established that you cannot do that? No, it's not. I can't find a case that says that. What I do find, and have cited, are cases that say, you know what, even if you've destroyed them, and that was a bad thing to do, we're not sure that there's a First Amendment right to do that, or that's being violated in this case. The cases from different, you know, and you know what, Your Honors, this might be the case that answers all those questions once and for all, in that Saussure first part analysis, where we address every constitutional question up front. But the question here is, was it clearly established? And it's not. We may decide that police officers cannot stop somebody driving away after taking photographs. We may decide that police officers may never demand to see what's on the camera that you took. We may decide that when a citizen starts arguing about their supposed First Amendment rights, that you have a get out of free jail card, that you don't have to comply with any order. We may decide that here today. But it will not have been decided as the law that was clearly established in October of 2009. Your Honor, I do want to make a couple of quick technical points I wanted to make early. I ask in this case here that, speaking of the facts and the record, that this court make a decision on my objection to the second amended complaint in here, where what I have argued is that at pages 15, 20 to 20 of Artulli and Acciano's brief, is that what the plaintiff did is, in moving off to the side of the road, was contradicted himself. Where the plaintiff actually argued for four times in three pleadings was explaining his complaint. I was on the public road. I was on the public road. You can't stop me. You can't tell me not to do that. I think that makes a real different case from, hey, I pulled off the road. I pulled off the road to the right. I wasn't bothering anybody. The police were off in the distance lounging and having their donuts or whatever. It's a real different story. I mean, Judge Ferris is smiling because, you know, I think it does matter. It matters here. And what I'm asking the court to do is to address that. I'm trying to interpret my smile. Forget me, Your Honor. You've got about a minute and 20 seconds. I just want to remind you of that. All right. So I do ask the court to please address that question. The other thing is that in Chief Suba's argument, we could use a little additional clarity on what new or should have known means in the context of supervisory liability. I cited a bunch of district court opinions for the purpose of saying this is how district courts have interpreted it. New means new facts. Actual had actual knowledge of specific facts. Should have known is the should have known what the consequences of the knowledge of those facts would lead to a constitutional violation. Did you want to save some time? Yes, Your Honor. Thank you. All right. Good morning, Your Honors. May it please the court. Good morning. My name is Paul Hoffman. And for the plaintiff, James Adkins, with me is Anita Areola, who's co-counsel in this case in Guam. I think that we have answered actually almost everything that counsel has said in our briefs. I would like to focus just on the fact that the Second Amendment complaint lays out a clear violation of the Fourth Amendment. There was no basis to stop him at all. And there's never been one that's been articulated. Well, he did articulate one. I'm sure you'll disagree with it, but his articulation is that there was either a crime in progress or one about to be committed, and the identification of the specific crime is an obstruction. Well, right. But basically that argument is that because he was driving away from the scene to get away from the scene, somehow or another that might have led to some of it. I mean, it's just fantasy. And I think counsel can't get away from arguing the facts the way he wants them to be rather than what's in the amended complaint. And what's in the amended complaint is that he wasn't obstructing. He pulled off the road. He took pictures, which he has a right to do. Just a minute. Yes. Can you stop the clock? Okay. I hope it wasn't something I said. Oh, no. It was nothing you said. I'm sorry. Okay. Okay. Go ahead, counsel. Thank you, Your Honor. What I was going to say is that the allegations in the second amended complaint are fairly clear that there was a clearly established Fourth Amendment violation. There was no basis for a stop.   No one said, well, we're going to stop. Someone's complaining about someone, a police officer coming over. What turns it into a violation is preventing him from going about his business. He pulled off the road. He had committed no violation of law. It's never been suggested that there's a violation of law to take a picture from the side of the road of something that's happened on a public road. He didn't obstruct the police based on the allegations in the complaint. Somewhere later down the line, the defendants can argue about their defenses to those allegations, but the allegations themselves lay out a clearly established violation of Fourth Amendment rights. This is a man who had the right to go about his business and not be stopped by the police from going about his business, from leaving the scene, certainly not on some hypothetical thing that when he drove off he might commit some crime that no one knows anything about. I don't think that's what the cases say at all. That language is pulled out of context in terms of the cases they've cited in the sense that if an officer is following somebody who looks like they're about to rob a bank or something like that, that's what they're talking about, not that they might go out and do something else that no one knows anything about. The whole purpose of Terry, as an exception to the Fourth Amendment, is that you have to have this reasonable basis in the possibility of criminal activity. There's nothing like that here, and there's nothing in the allegations in the complaint that would do that, and the district court properly found that we had alleged a Fourth Amendment violation. With respect to First Amendment retaliation, which wasn't really discussed very much, there's a three-prong test that's been established for a very long time in the circuit. The first prong has to be that you're engaged in constitutionally protected activity. The second one is that there has to be something that the defendant does that would chill a person of ordinary fortitude, and there has to be a causal force. The First Amendment activity has to be a substantial motivation in the defendant's actions, and you don't have to allege a lack of probable cause under the Schood case. Now, with respect to that, it's clear that there's a chill. He was arrested. He was booked under Schood. That's clearly chill. The causation is also fairly clear. The court said that when he started to challenge the officers, the officers escalated the situation, and so it's clear that at least as a matter of allegation, as opposed to proof at trial and the rest, that he's said that. The interesting wrinkle on constitutionally protected issue is that the court found that the challenge, the verbal challenge that was saying to them that he had a right to do it and then them retaliating against him was enough to meet the first prong. And that's really not ñ it can't be much in dispute because the Duran case is a case where the constitutionally protected activity were shouting obscenities and profanities at the officers in Spanish, whereas our Mr. Adkins behaved as a complete gentleman in terms of what he did. He had a right under the constitution that he believed he had, and he was going to assert it against these officers that didn't know what the constitution meant and had no clue. And he was going to do that even if it meant that he had to go to jail to protect his rights under the constitution. And so he had that. Now, we would ask the court to find also that taking pictures, taking photographs in this context, would also be constitutionally protected activity. In addition to challenging about it, the very act of it or being retaliated against for doing it, there's no question in a public forum on a public road that a person has the right to take pictures. I mean, the next thing we would know, the logic that would flow from the other side's position is that you're taking pictures on Mikey Key, where I live in Southern California, and an officer comes in and says, you know, I'd like to see your pictures. In fact, if you don't give me your camera, I'm going to arrest you because maybe you took pictures of something you shouldn't have taken pictures of. What about your claim of supervisory liability against Subha? Former Chief Subha. Mr. Subha, because it seems to me your theory is deliberate indifference, but your factual allegations are fairly sketchy, and I'm not sure that you've articulated enough to establish the causal link to the alleged constitutional violation. What the district court found was, and what we would stand behind, is that Defendant Subha is plausible. The allegation that Defendant Subha knew that the prosecutor had declined prosecution the very next day and had said that property should be returned, that he knew about those things because of his role in the department, because of how small the department is, because of the notoriety of the case, because it got media attention, because he's a prominent businessman, because there are only 10 arrests a day in Guam, so we're not talking about the same kind of thing as Sheriff Baca dealing with an 8,000-person police force and thousands of arrests every day. So you're talking about a different context, and a district court's entitled to use their common sense and the context of the situation to determine whether it is plausible to make that allegation. The other part of the Fourth Amendment claim, and we're really talking just about the Fourth Amendment claim in this context, I believe, because we've been given leave to amend with respect to the First Amendment claim against Defendant Subha. With respect to the Fourth Amendment claim, there's also this issue about the search of the cell phone, and what happened in that case, it's also just an absolutely clear violation of the Fourth Amendment. What happened in that case is they took the cell phone. They didn't search it. They didn't search the context of it in the beginning. They put it in a property bag. They should have given it back the next day, but they didn't. But put that aside for a second. As soon as Mr. Atkins sued them, including Defendant Subha, then subordinates of his had access to the phone, searched the phone without a warrant, and, of course, ultimately destroyed all the context of the phone. And I think it's absolutely clear from the cases that if you take a cell phone and you're not claiming a right to search it incident to an arrest, and in their letter of June 10th they disclaimed that they are making an argument based on search incident to arrest. Basically, what they're saying is that as soon as Mr. Atkins sued the defendants, including Subha, that that waived his rights, I guess, under the Fourth Amendment to have them have to go to get a warrant. And that's just preposterous. When the AG notified the police department that he was not going to prosecute, did your client seek a return of seized property? I think he sought return of the cell phone fairly consistently, both in terms of right away what happened. And his lawyer came right down to the station house that same day. And they have assiduously sought return, and they sued in order to deal with that within two months of this happening. And it was right after that that the search of the cell phone happened. And whatever controversy there may be about whether you need a warrant for a search incident, a warrant to go into the contents of the cell phone, and that's the case that we've cited to the court in our supplemental authority, where the First Circuit has said you have to have a warrant in all circumstances. And there may be some difference of opinion about search incident, but there cannot be any difference of opinion about the fact that in order to search somebody's cell phone with all the private information that may be in there, telephone numbers, medical information, who knows these days, you have to either have a warrant or you have to have some exception to the Fourth Amendment warrant requirement. And in this case, there's just no possible exception that applies. And so they needed a warrant, and they didn't get it. And I think it's plausible to go back to defendant's suit, but it's more than plausible, as the court found, that he was aware and acquiesced in the violation of these constitutional rights. And I'm not even sure, actually, that we have to show deliberate indifference in the context of a Fourth Amendment claim for the wrongful search of the cell phone. If he knew that that was happening and he acquiesced in his subordinates' doing it or directed them to do it, as the evidence may show, then that violates the Fourth Amendment. I think that the district court was well within her discretion to find that defendant Suba could be held to answer for the claims that he was held to answer for, which were not all the claims. She rejected some of the claims with respect to defendant Suba. And I think the Iqbal cases, of course, I mean, there are hundreds of post-Iqbal cases, and they go all around the block. And I think that the cases where the people have positions of national responsibility and the allegations are things like purposeful discrimination, which is the Iqbal situation itself, those require a higher standard of proof. And for relatively simple cases in smaller environments where it's plausible to think that these things happened, there's really not as serious an Iqbal bar. And I think it is a bar that depends on the complexity and the context, because it's plausibility. This is just to be able to allege this claim, and it gives fair notice to Suba. It fits the requirements of Starr v. Baca in terms of the purposes of the Iqbal requirement. And in terms of reopening the question of whether we should have been allowed to file a Second Amendment complaint, I think, number one, it's not clear if there's any jurisdiction over that. But even if there was, the district court had before it all the reasons and made a perfectly reasonable decision to allow it. And there's absolutely no basis to find that it was an abuse of discretion if that issue is properly before the court. So what I would say is that if you look at the Second Amendment complaint, what it actually says. What does it say about Officer Suba, specifically? I wanted to go back to Judge Wynn's question about supervisor liability. What specifically was alleged about that? There are a lot of different allegations about Chief Suba in terms of his responsibility for orders, his failure to train and the like. There's a whole section about the liability of Suba that starts at ER 29 through ER 32. There's paragraphs 29 through 38 of the complaint. And a lot of those allegations go to more general issues. It just talks about it was his duty, paragraph 29, to prescribe by general order a directive. But what specifically about him? Well, I think what the complaint is based on is that this man is arrested. He comes into the stations. There are two different ones. And the prosecutor the next day declines to prosecute and says give back the cell phone. And the cell phone is not given back. I mean, it's held for five months for no reason, and it's searched a couple of months later right after Chief Suba is sued, among others, for return of the cell phone. And so the allegation is that he knew that these things were happening and didn't stop them. But there's also a lot of allegations about the general training that he did not engage in. And those were actually not part of the claim that the judge allowed to go forward. And in terms of the size of the Guam Police Department, and those are not actually alleged in the complaint, but what our argument is is that the judge is fully familiar with the size of the Guam Police Department, the context in which this is going on, because as a district judge there she would know those things and have an ability to determine whether it was plausible that if the prosecutor had declined in this kind of case, where it is alleged that our client is a prominent businessman and that it's plausible that he would know about that and at least would have acquiesced in these violations. Because of the smallness of the department? I mean, how are we to judge what the judge knew? Well, no, I understand that. But all I'm saying is that the judge believed on these allegations in the context in Guam that it was plausible for it to be alleged that he knew about this enough so that he could have acquiesced in these constitutional violations from a pleading standpoint. I mean, it's obviously going to be very easy to determine whether he did or he didn't know. I mean, it's not going to be a situation like Chief Baca to determine whether he knew about a wide-ranging practice. It's not as difficult as that, and that was allowed to go forward. This is a much smaller context in which it would be relatively easy to figure that out very quickly. It's not going to subject him to continued litigation once that factual thing is there. Because the judge acknowledges that he has to know. I mean, it's not that she's gotten the standard wrong. She acknowledges that in order to acquiesce in the subordinates' constitutional violations, he has to know that they're happening. All right. Thank you. Is that only 35 seconds total? I didn't reserve? You're keeping track of your own time. I'm sorry. Go ahead, counsel. You have a point to make. I'll be happy to hear you out. The plaintiff's arguments on Suba are a throwback to Respondee at Superior. You know, the argument that he should have known because of the size, the plaintiffs cite 3,500 arrests during 2009 alone. And from that, it's like Mayberry, chief of police, is supposed to know everything's going on and know. But even assuming that to be the case, there's no affirmative duty on the part of the police department under the Constitution to make sure that Mr. Adkins gets his phone back. There's a process under Guam law by which I see my time's up. Go ahead. Finish. There's a process under Guam law that as soon as he knows that the case is over and it's been dismissed, he can go down and he can apply for it. And that's all cited in the brief. So there isn't another constant. And the idea that you could go back and get a, you know, you're supposed to get a search warrant after the criminal charges have been dismissed doesn't make sense. The question is, can you look at these things that you have in your possession while you have them that are now, that Mr. Adkins has waived his expectation of privacy on because he's brought suit about their contents. All right. Thank you very much, counsel. We appreciate your arguments on both sides. The case of Adkins v. Anciano et al. is submitted. And the court is adjourned for this session.
judges: Farris, Nelson, Nguyen